## IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
### DIVISION OF ST. THOMAS AND ST. JOHN

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 3:21-cr-0009 |
| ) | |
| **GERALDO ALVERIO MORALES, JESUS** ) | |
| **JAVIER LEBRON PINTO, ALCIBIADES FLIS** ) | |
| **BATISTA, and JOSHUA LABOY LOZADA,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

**APPEARANCES:**

**DELIA SMITH, UNITED STATES ATTORNEY**
**ADAM SLEEPER, ASSISTANT UNITED STATES ATTORNEY**
OFFICE OF THE UNITED STATES ATTORNEY
ST THOMAS, U.S. VIRGIN ISLANDS
　　*FOR THE UNITED STATES*

**MIGUEL OPPENHEIMER, ESQ.**
SAN JUAN, PR
　　*FOR DEFENDANT GERALDO ALVERIO MORALES*

**JENNIE MARIEL ESPADA, ESQ.**
SAN JUAN, PR
　　*FOR DEFENDANT JESUS JAVIER LEBRON PINTO*

**CLIVE C. RIVERS, ESQ.**
LAW OFFICE OF CLIVE RIVERS
ST. THOMAS, U.S. VIRGIN ISLANDS
　　*FOR DEFENDANT ALCIBIADES FLIS BATISTA*

**MICHAEL L. SHEESLEY, ESQ.**
MICHAEL L. SHEESLEY, P.C.
ST THOMAS, U.S VIRGIN ISLANDS
　　*FOR DEFENDANT JOSHUA LABOY LOZADA*

### MEMORANDUM OPINION

**MOLLOY, Chief Judge.**

**BEFORE THE COURT** are Defendant Joshua Laboy Lozada's ("Lozada") Motion to Dismiss Criminal Information, (ECF No. 56), joined by Defendants Jesus Javier Lebron Pinto ("Pinto") (ECF No. 59), Gerardo Alverio Morales ("Morales") (ECF No. 61), and Alcibiades Flis Batista ("Batista") (ECF No. 77). Also before the Court is Batista's Motion to Dismiss (ECF No. 76). United States of America ("the Government") opposed the motions. (ECF No. 79.) The Court held a hearing on the aforementioned motions on January 4, 2023. For the reasons stated below, the Court will deny the motions.

## I. BACKGROUND

On April 8, 2021, the Government filed an affidavit in support of a criminal complaint by a Special Agent with the U.S. Department of Homeland Security, Homeland Security Investigations ("HIS"), who stated that, on April 7, 2021, Customs and Border Protection Air and Marine Operations agents were conducting border security patrols in the area of Stumpy Beach, on the west end of St. Thomas, Virgin Islands, which is known by law enforcement officers to have a long history of contraband smuggling activity. (ECF No. 1-1 ¶ 5.) Along the rugged road leading towards Stumpy Beach, the agents observed a silver Ford Explorer passing with dark tinted windows. (*Id.*) During the patrol at the beach area, an unknown male emerged from the bushes and appeared to be nervous upon seeing the agents. (*Id.*) The agents became suspicious and observed the unknown male talking on his cell phone. (*Id.*) They also observed that the silver Ford Explorer drove to the beach area and did not observe any vessels on Stumpy Beach. (*Id.*) The occupant of the silver Ford Explorer approached the unknown male, and they began talking to each other. (*Id.* ¶ 5.) At approximately 1905 hours, the agents observed a wake in the ocean, heard a boat engine in the beach area, and notified the other team members that a vessel traveling without navigating lights was in the Stumpy Beach area. (*Id.* ¶ 6.) After the vessel approached the area, the silver Ford Explorer was observed traveling from the beach area to the main road. (*Id.*) The agents saw the silver Ford Explorer attempting to leave the Stumpy Beach area and identified themselves by shining their vehicle lights along with the law enforcement blue lights. ((*Id.*) After seeing the lights, the driver, later identified as Batista, reversed the silver Ford Explorer until it was stuck in

the dirt. (*Id.*) When the vehicle became stuck, Batista exited the vehicle and ran into the bushes. (*Id.*)

The agents then approached the silver Ford Explorer stuck in the road to check the vehicle for additional occupants, finding none, but they observed three large black bags in the trunk of the vehicle. (*Id.* ¶ 7.) The agents who were at sea observed that a blue center console vessel #PR7461GG was beached on Stumpy Beach. (*Id.*) Additional law enforcement officers were called to assist with the search for the occupants of the vessel and the driver of the silver Ford Explorer. (*Id.*) A few hours later, the agents found Morales, Pinto and Batista in the bushes of Stumpy Beach. (*Id.*) All were transported to the HSI office for questioning and processing. (*Id.*)

According to the Special Agent, Pinto waived his Miranda rights and stated that he departed Fajardo, Puerto Rico, at approximately 1500 hours with Morales to go fishing. (*Id.* ¶ 8.) They travelled to Culebra in a blue vessel but Morales, who was captaining the vessel, became lost and they landed in St. Thomas. (*Id.*) The Special Agent stated that Batista waived his Miranda rights and stated that he was exercising in the area where he was found, which is what he regularly does in the Stumpy Beach area after work by walking from Savan to the Stumpy Bay area. (*Id.*) The three black bags in the trunk of the silver Ford Explorer were wet and contained approximately $1.2 million dollars in U.S. currency, wrapped in several bundles of vacuum sealed plastic. (*Id.* ¶ 9.) Law enforcement officers also found a loose battery in the blue center console of the vessel, which, from the Special Agent's knowledge and experience, is used to attach it to contraband for the purpose of throwing it overboard to sink. (*Id.* ¶ 10.)

On April 9, 2021, the Government filed an affidavit by the Special Agent containing additional statements concerning Lozada. (*Id.* ¶ 3.) The Special Agent stated that, on April 8, 2021, at approximately 1145 hours, law enforcement agents returned to the area of Stumpy Beach and encountered Lozada who was without a shirt and wearing swim shorts and flip flops. (*Id.* ¶ 10.) According to the Special Agent, Lozada waived his Miranda rights and stated that he departed Fajardo, Puerto Rico, on April 7, 2021, with Morales and Pinto, and was paid to pick up a large amount of money in St. Thomas. (*Id.*) Upon approaching St. Thomas, they

were signaled by someone on land at the Stumpy Beach to enter, but the vessel became stuck in the sand at the beach. (*Id.*) They never received the money. (*Id.*) Lozada was able to avoid law enforcement on the night of April 7, 2021, by hiding in the bushes. (*Id.*)

On April 9, 2021, the Government filed an Information charging all Defendants with conspiracy to conceal and concealing more than $100,000 in U.S. currency, in violation of the Maritime Drug Law Enforcement Act ("MDLEA"), 46 U.S.C. § 70503(a)(3), and alleging forfeiture pursuant to 46 U.S.C. § 70507, and charging Batista with improper entry by alien, in violation of 8 U.S.C. § 1325(a). (ECF No. 14.) The Government alleged that, on or about April 7, 2021, Defendants knowingly and intentionally conspired to conceal and concealed approximately $1,280,000 "in any conveyance, article of luggage, merchandise, or other container, or compartment of or aboard a vessel outfitted for smuggling subject to the jurisdiction of the United States." (*Id.* 1-2). After Defendants filed the instant motions to dismiss, the grand jury Indictment was filed on November 19, 2021, charging Defendants with the same charges in the Information, except that the amount of U.S. currency was alleged to be $1,269,851. (ECF No. 120.)

## II. LEGAL STANDARD

"It is a basic tenet of constitutional law that Congressional statutes are presumptively constitutional and should not be struck down unless 'clearly demonstrated' otherwise." *Nat'l Collegiate Athletic Ass'n v. Christie*, 926 F. Supp.2d 551, 557 (D.N.J. 2013) (citations omitted). "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). "An as-applied attack, in contrast, does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right. *See, e.g., Wis. Right to Life, Inc. v. FEC,* 546 U.S. 410, 411–12, 126 S.Ct. 1016, 163 L.Ed.2d 990 (2006) (per curiam)." *United States v. Marcavage*, 609 F.3d 264, 273 (3d Cir. 2010). "[T]he distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge. The distinction is both

instructive and necessary, for it goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010).

"In our constitutional order, a vague law is no law at all." *United States v. Davis*, 139 S. Ct. 2319, 2323 (2019). "As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983); *United States v. Fontaine*, 697 F.3d 221, 226 (3d Cir. 2012) ("A statute is unconstitutionally vague under the Due Process Clause if it '(1) 'fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits'; or (2) 'authorizes or even encourages arbitrary and discriminatory enforcement.'"). "Impossible standards of specificity are not required. The test is whether the language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." *Jordan v. De George*, 341 U.S. 223, 231–32 (1951).

"A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning. Therefore, we look to the ordinary meaning of the term [challenged] at the time Congress enacted the statute." *Perrin v. United States*, 444 U.S. 37, 42 (1979) (citation omitted); *see Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1738 (2020) ("This Court normally interprets a statute in accord with the ordinary public meaning of its terms at the time of its enactment."); *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019) ("In statutory interpretation disputes, a court's proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself.").

### III. DISCUSSION[1]

---

[1] For the reasons stated on the record, Defendants' arguments based on Rule 5.1 and Rule 7 of the Federal Rules of Criminal Procedure were mooted by the filing of the Indictment in this case. Defendant Batista's arguments that "[t]he absence of an indictment is a jurisdictional defect which deprives the court of its power to act," and he did not waive "his Fifth Amendment right to presentment of an indictment to a grand jury" (ECF No. 76 at 3, 5), are rejected as meritless. *See* 48 U.S.C. § 1614(b) (In the District Court of the Virgin Islands, "all criminal prosecutions under the laws of the United States, under local law under section 1612(c) of this title, and under the income tax laws applicable to the Virgin Islands may be had by indictment by grand jury or by

MDLEA's Section 70503(a)(3) provides that "an individual may not knowingly or intentionally . . . conceal, or attempt or conspire to conceal, more than $100,000 in currency or other monetary instruments on the person of such individual or in any conveyance, article of luggage, merchandise, or other container, or compartment of or aboard the covered vessel if that vessel is outfitted for smuggling." The relevant conduct prohibited by Section 70503(a)(3) is knowingly or intentionally concealing and conspiring to conceal more than $100,000 in currency aboard a covered vessel[2] that is outfitted for smuggling.

Defendants assert a facial challenge to Section 70503(a), arguing that "[t]he requirement that the 'vessel is outfitted for smuggling' is unconstitutionally vague" or at least ambiguous because it is "subject to unnumerable meanings," or "at least two or more meanings." (ECF No. 56 at 4.) Defendants assert that "[w]ater, provisions, electronics, batteries, any of these things could 'outfit' a vessel for 'smuggling' (just as easily as it could 'outfit' a vessel for a long fishing outing, or even a three-hour tour)." (*Id.* at 11.) According to Defendants, "a statute that requires people to surmise what outfits a seafaring vessel for smuggling as opposed to what outfits a vessel for a trip, demands the impossible." (*Id.*) Additionally, Defendants assert that Section 70503(a)(3) should be invalidated on *ex post facto* grounds because, "[g]iven technological and shipping advancement since 1980, the meaning of "outfitted for smuggling" could change drastically, e.g., as larger ships and longer shipping routes require larger fuel or battery stores." (*Id.* at 12.)

With respect to the facial challenge to Section 70503(a)(3), Batista argues that "[t]he statutory language begs the question of 'what' is meant by 'smuggling' and 'who' determines that a vessel is outfitted for smuggling, and on what grounds do they do so." (ECF No. 76 at 8.) For example, "placing coolers in a vessel for a day trip or a fishing excursion can easily be [mis] construed as 'outfitting' a vessel for smuggling and thereby put an innocent owner of ordinary intelligence in jeopardy of running afoul of the statute." (*Id.*) Batista also asserts an

---

information"); *Gov't of Virgin Islands v. Dowling*, 633 F.2d 660, 667 (3d Cir. 1980) ("In the unincorporated Territory of the Virgin Islands the requirement of the Fifth Amendment for indictment of a grand jury is not applicable and prosecutions have always been instituted by information rather than by indictment.").

[2] Section 70503 defines "covered vessel" as follows: "In this section the term "covered vessel" means--(1) a vessel of the United States or a vessel subject to the jurisdiction of the United States; or (2) any other vessel if the individual is a citizen of the United States or a resident alien of the United States." 46 U.S.C.A. § 70503 (e).

*United States v. Morales et al.*
Case No. 3:21-cr-0009
Memorandum Opinion
Page **7** of **12**

as-applied challenge, arguing that the Government's "affidavit makes it clear he was nowhere near the boat and perhaps had nothing at all to do with the vessel." (*Id.* at 8-9.) According to Batista, the lack of clarity in the statute does not give fair notice of the offending conduct to him and the statute "utilizes terms that require the government to put its interpretative spin on what the language means, and then invites the government to use that spin to criminalize conduct that ordinary citizens have no reason to believe is illegal." (*Id.* at 10-11.)

The Government argues that the MDLEA provides for criminal penalties for certain types of smuggling and includes a civil forfeiture provision, 46 U.S.C. § 70507, which "provides that certain enumerated common smuggling tactics are prima facie evidence of a violation of Title 46, Section 70503 for civil forfeiture purposes." (ECF No. 79 at 15-16.) Moreover, the Meriam-Webster Dictionary defines the terms "outfit" as "the act of fitting out or equipping (as for a voyage or expedition)," and some of the factors specified in Section 70507 indicating that a vessel was engaged in smuggling require the fitting out or equipping a vessel, such as "the presence of any compartment or equipment that is built or fitted out for smuggling." (*Id.* at 17.) According to the Government, if a vessel was built with a number of secret compartments for smuggling contraband, it would fall within the scope of the statute, which is why Defendants cannot succeed on a facial challenge. (*Id.*) The Government argues that the Court should not reach the as-applied challenge because a Rule 12(b)(1) motion is limited to the allegations in the charging document, whereas an as-applied challenge requires consideration of the specific conduct at issue and, "no facts are alleged in the indictment[3] that would provide a basis for an as-applied challenge." (*Id.* at 18.) Even if considering an as-applied challenge is proper, it is meritless because "[i]n this case, the defendant's vessel was equipped with four spare batteries, several of which were automotive batteries, which were not in use (in addition to those four batteries, the boat was equipped with two other batteries, which were in use)."[4] (*Id.* at 20.) At trial, the Government's witness will testify that these types of batteries are commonly used by smugglers to anchor contraband in the event that the smugglers are caught." (*Id.*) Additionally, although it was

---

[3] The Court notes that, at the time the Government filed its opposition to the motions to dismiss on May 20, 2021, no indictment was filed in this case. The indictment was filed on November 19, 2021. (ECF No. 120.)
[4] No evidence exists in the record supporting these factual assertions by the Government.

after sundown, the vessel's lights were not turned on, and "the presence of three bags containing $1.28 million dollars in U.S. currency is cargo inconsistent with the type of declared purpose of the vessel." (*Id.*)

The MDLEA does not define the term "outfitted" nor does it define the term "smuggling." Defendants argue that it is impossible to know what constitutes "outfitting" a vessel "for smuggling" as opposed to outfitting a vessel for another purpose.

"When terms used in a statute are undefined, we give them their ordinary meaning." *Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187 (1995). In applying the ordinary meaning statutory interpretation canon to Section 70503(a)(3)'s language "outfitted for smuggling," the Court starts with the definitions of the words "outfitted" and "smuggling" in 2016, when Section 70503(a)(3) was enacted. *Eid v. Thompson*, 740 F.3d 118, 123 (3d Cir. 2014) ("When words are left undefined, we have turned to 'standard reference works such as legal and general dictionaries in order to ascertain' their ordinary meaning."); *United States v. Adair*, 38 F.4th 341, 350 (3d Cir. 2022) ("To discern the common ordinary meaning of [the challenged] terms at the time of § 3B1.1's promulgation, it is permissible to consult contemporary dictionaries.").

Merriam-Webster's Collegiate Dictionary, Eleventh Edition, in effect in 2016 when Section 70503(a)(3) was enacted, defines the verb to "outfit," which has two senses, as "outfit *vb* out-fit-ed; out-fit-ting *vt* (1847) 1: to furnish with an outfit 2: SUPPLY <*outfitting* every family with shoes>," and it defines the noun "outfit," which has three senses: "1: the act of fitting out or equipping (as for a voyage or expedition) 2 a: a set of tools or equipment esp. for the practice of a trade b: a clothing ensemble often for a special occasion or activity c: physical, mental, or moral endowments or resources 3: a group that works as a team." Merriam-Webster's Collegiate Dictionary (11th ed. 2014). The same dictionary defines the verb to "smuggle," which has two senses, as "smug-gle . . . *vt* smug-gled: smuggling . . . *vt (1687)* 1: to import or export secretly contrary to the law and esp. without paying duties imposed by law 2: to convey or introduce surreptitiously . . . *vi* to import or export something in violation of the customs laws." *Id.*

Except Batista's conclusory assertion that "[t]he statutory language begs the question of 'what' is meant by 'smuggling,'" Defendants do not appear to challenge the ordinary meaning of the individual words "outfitted" and "smuggling" and their common usage in 2016, as reflected in the above Merriam-Webster's Collegiate Dictionary definitions. Defendants' vagueness argument is that Section 70503(a)(3) does not provide any specifics on what constitutes outfitting a vessel for the purpose of smuggling as to distinguish it from outfitting a vessel for other purposes because "[w]ater, provisions, electronics, batteries, any of these things could 'outfit' a vessel for 'smuggling' (just as easily as it could 'outfit' a vessel for a long fishing outing, or even a three-hour tour)." (*Id.* at 11.)

The Merriam-Webster's Collegiate Dictionary provides an adequate foundation for the meaning of the words "outfitted for smuggling" as commonly understood by people of ordinary intelligence at the time of Section 70503(a)(3)'s enactment. The relevant ordinary meaning of the disputed words in this case is found in the first senses of the verb "outfit" ("to furnish with an outfit"), the noun "outfit" ("the act of fitting out or equipping (as for a voyage or expedition)") and the verb "smuggle" ("to import or export secretly contrary to the law and esp. without paying duties imposed by law"). The phrase "outfitted for smuggling" is based on the words that have ordinary meaning and they convey "sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." *Jordan*, 341 U.S. at 231–32. Accordingly, the ordinary meaning of Section 70503(a)(3)'s language "vessel is outfitted for smuggling" gives sufficient notice to people of ordinary intelligence of the conduct Section 70503(a)(3) prohibits. Although Defendants seem to argue that Section 70503(a)(3) lacks specificity as to the phrase "outfitted for smuggling," they do not cite to any binding authority requiring any specificity where the challenged statutory language has an ordinary meaning sufficient to warn of the proscribed conduct. *See Jordan*, 341 U.S. at 231-32. In light of the ordinary meaning of the words "outfitted for smuggling," there is no basis for any level of specificity with respect to those words.

Batista's conclusory assertion that the words "outfitted for smuggling" "require the government to put its interpretative spin on what the language means, and then invites the

government to use that spin to criminalize conduct that ordinary citizens have no reason to believe is illegal," without more, does not show that Section 70503(a)(3) "authorizes or even encourages arbitrary and discriminatory enforcement." *Fontaine*, 697 F.3d at 226 (3d Cir. 2012). Accordingly, the Court finds that the language "outfitted for smuggling" in Section 70503(a)(3) is not vague.

Since the Court finds that the challenged language of Section 70503(a)(3) is not vague, Defendants' argument based on the impossibility of compliance ground is rejected as meritless. The Court also finds that the phrase "outfitted for smuggling" in Section 70503(a)(3) does not contain "grievous ambiguity or uncertainty," as required for the rule of lenity to apply. *United States v. Barbosa*, 271 F.3d 438, 455 (3d Cir. 2001) ("The ambiguity must be such that, even after a court has 'seize[d] everything from which aid can be derived,' it is still 'left with an ambiguous statute.'") (citation omitted). Thus, the Court finds Defendants' ambiguity argument unpersuasive.

Concerning Defendants' argument that Section 70503(a)(3) violates the prohibition of *Ex Post Facto* laws contained in Article I, Section 10, Clause 1 of the U.S. Constitution, the Court notes that the Meriam-Webster's Collegiate Dictionary, Eleventh Edition, which was in effect in 2016, when Section 70503(a)(3) was enacted, is still in effect at the date of this decision. "Every ex post facto law must necessarily be retrospective" and "[e]very law that takes away, or impairs, rights vested, agreeably to existing laws, is retrospective." *Calder v. Bull*, 3 U.S. 386, 391 (1798). An *Ex Post Facto* law is every law that: (i) "makes an action, done before the passing of the law, and which was innocent when done, criminal; and punishes such action"; (ii) " aggravates a crime, or makes it greater than it was, when committed"; (iii) "changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed"; and (iv) "alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender." *Id.* at 390. Although Defendants point out that the MDLEA was enacted in 1980, Section 70503(a)(3) was not enacted until 2016. Defendants do not explain how Section 70503(a)(3) violates the *Ex Post Facto* Clause and their speculative assertion that the "meaning of 'outfitted for smuggling' could change drastically" at some unidentified

point in time is insufficient to show that Section 70503(a)(3) violates the *Ex Post Facto* Clause.

Since the Court finds that Section 70503(a)(3)'s language "vessel is outfitted for smuggling" is not vague under the ordinary meaning canon of statutory interpretation, it is unnecessary to address the forfeiture provision in Section 70507(b) on which the Government relies for its argument that it provides guidance on whether a vessel is outfitted for smuggling. The Court questions whether Section 70507(b) provides a basis to support such an argument given that, in the final version of Section 70507(b), Congress excluded the language "or prima facie evidence of a vessel outfitted for smuggling" from the initially proposed language, which stated:

> Practices commonly recognized as smuggling tactics may provide prima facie evidence of intent to use a vessel to commit, or to facilitate the commission of, an offense under section 70503 of this title **or prima facie evidence of a vessel outfitted for smuggling,** even in the absence of controlled substances aboard the vessel. The following indicia, among others, may be considered, in the totality of the circumstances, to be **prima facie evidence that a vessel** is intended to be used to commit, or to facilitate the commission of, such an offense or **is outfitted for smuggling** . . ..

S. REP. 114-168 (emphases added); *See United States v. Nasir*, 17 F.4th 459, 471–72 (3d Cir. 2021) ("As a familiar canon of construction states, *expressio unius est exclusio alterius*: the expression of one thing is the exclusion of the other."); *Russello v. United States*, 464 U.S. 16, 23 (1983) )("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."). However, having found that Section 70503(a)(3) is not vague on its face based on the ordinary meaning canon of statutory interpretation, the Court need not decide the applicability of Section 70507(b) in this case.

Lastly, the Court agrees with the Government that Batista's as applied challenge to Section 70503(a)(3) is procedurally improper. Apart from the affidavit attached to the complaint in this action, in which the Special Agent stated that "[l]aw enforcement found a loose battery in the blue center console vessel # PR 7461 GG," there is no evidence in the record of factual circumstances concerning the vessel, and the Information, which the instant

motions seek to dismiss, does not allege any specific facts concerning "a vessel outfitted for smuggling."

## IV. CONCLUSION

For the foregoing reasons, the Court will deny the motions seeking a dismissal of the charges in this case.

**Dated:** September 21, 2023                     */s/ Robert A. Molloy*
                                                   **ROBERT A. MOLLOY**
                                                   **Chief Judge**